UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

HPIL HOLDING, INC.,

       Plaintiff,

v.

STEPHEN BROWN, et. al,

       Defendants.
_____/

Case No. 1:24-cv-10479

Honorable Thomas L. Ludington
United States District Judge

**OPINION AND ORDER DENYING PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER WITHOUT PREJUDICE**

On the eve of a proxy meeting, Plaintiff HPIL Holding, Inc. seeks an emergency *ex parte* temporary restraining order to enjoin Defendant Stephen Brown and his Codefendants from selling their shares and from acting or appearing as HPIL directors, officers, or employees. But Plaintiff has not complied with either procedural requirement of Rule 65(b)(1), so its Emergency *Ex Parte* Motion will be denied without prejudice.

**I.**

Plaintiff HPIL Holding, Inc. (HPIL) is a publicly traded Wyoming corporation which once had a principal place of business in Midland, Michigan.[1] ECF No. 1 at PageID.3. Plaintiff provides little detail about the nature of HPIL's business. HPIL's online company profile is similarly light on detail. *See HPIL Holding*, BLOOMBERG, https://www.bloomberg.com/profile/company/HPIL:US?embedded-checkout=true (last visited March 5, 2024) (describing HPIL as a "worldwide diversified holding company . . . focused on investing in both private and public companies in

---

[1] Plaintiff notes that its principal place of business was moved from Midland to Southampton, New Jersey, in late 2022. *See* ECF No. 1 at PageID.7.

differing business sectors. HPIL Holding does not restrict its potential candidate target companies to any specific business, industry or geographical location and, thus, acquires various types of business.") [https://perma.cc/DJ8H-SXQM]. In 2020, Haining Zhang—a nonparty—filed a case in the 42nd Circuit Court in Midland to appoint Angela Collette—a nonparty—to serve as HPIL's receiver, representing that HPIL was delinquent in various respects and in need of rehabilitation. *Id.*; *see also* ECF No. 1-2. After Collette was appointed as HPIL's receiver, Plaintiff alleges that she and Zhang diluted HPIL's shares to present Plaintiff as a reverse-merger target. *Id.* at PageID.4.

A reverse merger, generally, is "a way for private companies to go public," and often involves a private company acquiring the majority shares of a public company—like HPIL—which then serves as the private company's shell. *See* Marvin Dumont, *Reverse Mergers: Advantages and Disadvantages*, INVESTOPEDIA, (May 18, 2022), https://www.investopedia.com/articles/stocks/09/introduction-reverse-mergers.asp [https://perma.cc/U2RW-67AE]. Reverse mergers are often attractive for private companies that want to publicly trade without raising start-up capital and going through the IPO process. *Id.*

In April 2021, Zhang and Collette entered an "Agreement and Plan of Reorganization" which transferred 92% of HPIL's shares to a private Canadian company called "Cybernetic Technologies, Ltd." (Cybernetic), which was wholly owned by Stephen Brown. ECF No. 1 at PageID.4. In return, Zhang and Collette were paid $50,000 each, Zhang received 4% of HPIL's shares, and Collette received 2% of HPIL's shares. *Id.* The remaining 2% of Plaintiff's shares were left for "non-affiliated shareholders." *Id.* Brown—who also owned Canadian companies Crank Media Inc. (Crank), Brown Family Investments, Ltd. (BFI), and controlled Canadian company Criteria Management, Ltd. (Criteria)—became HPIL's sole Director and CEO. *Id.* at PageID.5. Brown quickly named David Postula as HPIL's President. *Id.* at PageID.2, 5.

Plaintiff alleges that Brown and his affiliated companies, with the assistance Postula, and Tanya Larizza—Brown's personal assistant—then engaged in a scheme to "pump" HPIL's shares through a serious of fraudulent statements[2] and toxic investments,[3] only to then "dump" the shares

---

[2] Among other, general fraudulent statements scattered throughout Plaintiff's Complaint, Plaintiff alleges nine specific false statements:
   (1) On May 5, 2021, HPIL announced it signed a partnership agreement with Origin Protocol to mint NFTs, when no such agreement was signed. ECF No. 1 at PageID.10 (citing YouTube video in which Origin Co-Founder denied signing any agreement with HPIL); *see also* ECF No. 3-4 at PageID.310–11.
   (2) On July 22, 2021 HPIL announced it was launching a revolutionary gaming platform when there was no evidence such platform was in development. ECF No. 1 at PageID.10; *see also* ECF No. 3-4 at PageID.319–22.
   (3) On July 23, 2021, HPIL announced it was launching a revolutionary data analytics software when there was no evidence such software was in development. ECF No. 1 at PageID.10; *see also* ECF No. 3-4 at PageID.324–29.
   (4) On September 28, 2021, HPIL announce the sale of one of its divisions to Stargaze Entertainment Group, Inc. and that HPIL shareholders would receive corresponding shares. ECF No. 1 at PageID.11; *see also* ECF No.3-4 at PageID.313–14. But, despite publicly reporting on October 18 that the sale had closed, no HPIL shareholders every received Stargaze shares. ECF Nos. 1 at PageID.11; *see also* ECF No. 3-4 at PageID.316–17.
   (5) Brown publicly reported that "trusted investors" would participate in a buyback program on September 17, 2021 in which HPIL shareholders could sell their shares at market value. ECF No. 1 at PageID.11 (citing YouTube video of the alleged fraudulent statement). But the buyback never occurred. *Id.*
   (6) On March 24, 2022, HPIL "touted new video games, new technology, and new intellectual property", "none of which came to fruition." ECF No. 1 at PageID.11; *see also* ECF No. 3-4 at PageID.331–33.
   (7) On June 15, 2021, HPIL announced Apogee Dynamics, Ltd., a new company that would manufacture electric automobiles that would charge themselves while operating. ECF No. 1 at PageID.12; *see also* ECF No. 3-4 at PageID.335–41. Plaintiff alleges HPIL does not have access to such technology. ECF No. 1 at PageID.12.
   (8) On September 27, 2021, Brown noted on a form filed with the SEC that HPIL secured a $10,000,000 line of credit to invest in Auto Robotics when "there has been no evidence provided that this line of credit was secured" and no suggestion that HPIL was focused on this industry. ECF No. 1 at PageID.12; *see also* ECF No. 3-5 at PageID.362–63.
   (9) Brown "made consistently false statements" to shareholders and investors that HPIL retained various accounting firms to perform compliance audits when no firms were ever retained. ECF No. 1 at PageID.12–13.

[3] Plaintiff notes "[t]oxic lenders lend money to companies who are unable to raise capital in any other manner." Plaintiff alleges HPIL issued "convertible notes" to these toxic lenders in exchange for capital. Once matured, Plaintiff alleges these notes allowed toxic lenders to exercise the right

once their price was artificially inflated. *See generally id.* at PageID.5–15. Plaintiff alleges that Defendants' "pump and dump" scheme cost HPIL shareholders at least $3,000,000. *Id.* at PageID.15.

Accordingly, in August 2023, Plaintiff sued (1) Zhang, (2) Brown, (3) Collette, (4) Mark Osborne, (5) Andrew Badger, (6) Darcy Christopherson, (7) Postula, (8) BFI, (9) Crank, and (10) Criteria and alleged various contract claims, including violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq. HPIL Holding, Inc. v. Zhang et al.*, CN 23-cv-12050, ECF No. 1. But, on January 29, 2024, this Court dismissed Brown, Postula, BFI, Crank, and Criteria for lack of service. *HPIL Holding, Inc. v. Zhang et al.*, CN 23-cv-12050, ECF No. 24. Less than one month later, Plaintiff brought the above-captioned companion case against these five dismissed Defendants and Tanya Larizza. ECF No. 1. Plaintiff's nine-count Complaint alleges the following:

| Count | Claim | Defendants |
|---|---|---|
| I | Conversion / Embezzlement | Brown, Postula, Larizza, Crank, BFI |
| II | Brach of Fiduciary Duty & Self Dealing | Brown, Postula, Larizza |
| III | Civil Conspiracy | All Defendants |
| IV | Civil Conspiracy | All Defendants |
| V | RICO Conspired to Defraud | All Defendants |
| VI | Claim and Delivery | Brown |
| VII | Declaratory Relief | All Defendants |
| VIII | Injunctive Relief | All Defendants |
| IX | Disgorgement | All Defendants |

ECF No. 1.

In light of a proxy meeting HPIL is holding in the afternoon of March 5, 2024, Plaintiff filed an Emergency *Ex Parte* Motion for a Temporary Restraining Order (TRO) and Preliminary Injunction on the afternoon of March 4, 2024. ECF No. 3. Specifically, Plaintiffs seek an order:

---

to purchase significant amounts of HPIL shares at a drastically discounted rate. ECF No. 1 at PageID.8; *see also* ECF Nos. 3-11; 3-12; 3-13.

- 4 -

> (1) prohibiting [Brown] and all [P]arties or entities acting on his behalf, at his direction, or in concert with him from acting or appearing to act, in any way, as an officer, director, or employee of HPIL pending further order of this Court; and
> (2) prohibiting Brown, and all [P]arties and entities acting on his behalf, at his direction, or in concert with him from incurring further debt which could bind HPIL, dilution of HPIL's shares, and transferring any shares Brown currently holds pending further order of this Court.

*Id.* at PageID.255.

## II.

A Court may issue an *ex parte* temporary restraining order, but only if "(A) specific facts in an affidavit or a verified complaint *clearly show* that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to [notify the other party] and the reasons why [notice] should not be required." FED. R. CIV. P. 65(b)(1).

If these two procedural requirements are satisfied, then the merits of the motion may be considered. "[T]he purpose of a [temporary restraining order] under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996). In determining whether to grant such relief, a court must weigh four factors:

> (1) whether the movant has a strong likelihood of success on the merits,
> (2) whether the movant would suffer irreparable injury absent preliminary injunctive relief,
> (3) whether granting the preliminary injunctive relief would cause substantial harm to others, and
> (4) whether the public interest would be served by granting the preliminary injunctive relief.

*A & W X-Press, Inc. v. FCA US, LLC*, No. 21-1805, 2022 WL 2759872, at *3 (6th Cir. July 14, 2022); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007). "The standard for issuing a temporary restraining order is logically the same as for a preliminary injunction with emphasis, however, on irreparable harm given that the purpose of a

temporary restraining order is to maintain the status quo." *ABX Air, Inc. v. Int'l Bhd. of Teamsters*, 219 F. Supp. 3d 665, 670 (S.D. Ohio 2016).

### III.

Plaintiff's Emergency *Ex Parte* Motion for a Temporary Restraining Order and Preliminary Injunction will be denied because Plaintiff has not complied with either requirements of Rule 65(b)(1).

First, Plaintiff has not presented specific facts which *clearly* shown immediate and irreparable injury, loss, or damage that will result before Defendants can be heard in opposition. Plaintiff alleges that Brown and his Codefendants have "done immeasurable harm to HPIL" in the past and "seek[] to continue this course of conduct through any means that do not include honesty and transparency." ECF No. 3 at PageID.261–62. Plaintiff also argues that HPIL's March 5, 2024 proxy meeting evidences immediate and irreparable injury because the meeting "will certainly create additional chaos and cause HPIL further harm." *Id.* at PageID.257, 262. But how? Plaintiff does not say. Although Defendants' continued corporate conduct and the March 5 proxy meeting *might* harm Plaintiff, the mere *possibility* of continued or future harm does not warrant the extraordinary remedy of an *ex parte* TRO. *See Hacker v. Fed. Bureau of Prisons*, 450 F. Supp. 2d 705, 710 (E.D. Mich. 2006) (noting an *ex parte* TRO is an "extraordinary remedy that generally is reserved for emergent situations in which a party may suffer irreparable harm during the time required to give notice to the opposite party or where notice itself may precipitate the harm."). Plaintiff has not presented specific facts which clearly show that immediate and irreparable injury will occur before Defendants can be heard. *See* FED. R. CIV. P. 65(b)(1)(A).

The second procedural requirement of Rule 65(b)(1) is also not satisfied. Plaintiff's Counsel has not "certif[ied] in writing" any efforts made to notify Defendant, nor attempted to

- 7 -

explain why notice should not be required. *See* FED. R. CIV. P. 65(b)(1)(B). Plaintiff attached 19 exhibits to its Emergency *Ex Parte* Motion. *See generally* ECF No. 3. But nowhere in its Motion or 255 pages of exhibits does Plaintiff discuss notice to Defendants. *See generally id.* By the express terms of Rule 65, Plaintiff's Motion cannot be granted. *See Moore v. U.S. Ctr. for SafeSport*, No. 1:23-CV-11681, 2023 WL 4919649, at *4 (E.D. Mich. Aug. 1, 2023) (denying emergency *ex parte* TRO because plaintiff did not allege specific facts clearly showing irreparable injury and because plaintiff's counsel did not certify notice efforts) (collecting cases).

In sum, because Plaintiff has not satisfied either procedural requirement of Civil Rule 65(b)(1), its Motion will be denied without prejudice.

**IV.**

Accordingly, it is **ORDERED** that Plaintiff's Emergency *Ex Parte* Motion for Temporary Restraining Order, ECF No. 3, is **DENIED WITHOUT PREJUDICE**.

**This is not a final order and does not close the above-captioned case**.

Dated: March 5, 2024                                s/Thomas L. Ludington
                                                    THOMAS L. LUDINGTON
                                                    United States District Judge